OA 91  Criminal Complaint

# United States District Court

**FILED**

NORTHERN DISTRICT OF CALIFORNIA

2008 JUL 16  P 3: 06

RICHARD W. WIEKING
CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA. S.J.

UNITED STATES OF AMERICA
V.
JESUS CORTEZ ZENDEJAS, and
JAZMIN MARIE ROSEL

E-FILING

**CRIMINAL COMPLAINT**

Case Number: **08-70450 HRL**

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about **July 5, 2008** (Date) in **Monterey** County, in the **Northern** District of **California** defendant(s) did,

(Track Statutory Language of Offense)

COUNT ONE: agree and conspire to commit the offense described in Count Two, in violation of 18 U.S.C. 371; COUNT TWO: by force, violence, and intimidation, take from the persons and presence of an employee of the US Bank, located at 1320 South Main Street, Salinas, California, approximately $21,326.25 in monies belonging to and in the care, custody, control, management, and possession of that bank, the funds of which were then insured by the Federal Deposit Insurance Corporation; and further, that in committing that offense the first-named defendant did assault and put in jeopardy the lives of employees of said bank by the use of a dangerous weapon, to wit: a BB gun,

in violation of Title **18** United States Code, Section(s) **2113(a) and (d), and 2**

I further state that I am a(n) **Special Agent, Federal Bureau of Investigation** and that this complaint is based on the following facts:
Official Title

See Attached Affidavit of Special Agent Douglas C. Turner

PENALTIES: Count One: up to 5 years prison, $250,000 fine, 3 year TSR; $100 SAF;
Count Two: up to 25 years imprisonment, $250,000 fine, 5 year TSR, $100 SAF

REQUESTED BAIL: No Bail (Government Will Request Detention)

REQUESTED PROCESS: Arrest Warrant for each defendant

Continued on the attached sheet and made a part hereof: ☒ Yes ☐ No

Approved As To Form: _____ AUSA

Signature of Complainant: Douglas C. Turner, FBI

Sworn to before me and subscribed in my presence,

Date: 7/16/08 at SAN JOSE, CALIFORNIA
City and State

HOWARD R. LLOYD    United States Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

DOCUMENT NO. 1
CSA's INITIALS: e
DISTRICT COURT CRIMINAL CASE PROCESSING

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

AFFIDAVIT OF SPECIAL AGENT
DOUGLAS C. TURNER IN SUPPORT OF
CRIMINAL COMPLAINT AND ARREST

I, Douglas C. Turner, Special Agent of the Federal Bureau of Investigation (FBI), Department of Justice, San Jose, California, being first duly sworn, depose and say:

### INTRODUCTION

1. This affidavit is made in support of a criminal complaint and arrest warrant for Jesus Cortez ZENDEJAS, and Jazmin Marie ROSEL, for their violation of Title 18, United States Code, Sections 2113 (a) (Bank Robbery), 371 (Conspiracy) and 2 (a) (Aiding and Abetting). Both individuals are currently being detained on state related bank robbery charges in Monterey County. Based on the following facts, there is probable cause to believe that ZENDEJAS and ROSEL have violated the above-said federal offenses.

### APPLICABLE LAW

2. Title 18, United States Code, Section 2113 provides in pertinent part:

(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person of another, or obtains or

attempts to obtain by extortion any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession, of any bank… [is guilty of a crime].

3.  Title 18, United States Code, Section 371 provides in pertinent part:

(a) If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy… [is guilty of a crime].

4.  Title 18, United States Code, Section 2 (a) provides in pertinent part:

(a) Whoever commits and offense against the United States or aids, abets, counsels, commands, induces or procures its commission… [guilty of a crime}.

**AGENT BACKGROUND**

5.  I am a Special Agent of the Federal Bureau of Investigation (FBI) currently assigned to the San Francisco Division, and have been so employed for approximately three years. Before that, I was employed as a Special Agent of the United States Secret Service (USSS) for approximately six years, where I was assigned to the Spokane Resident Office, Los Angeles

Field Office, and to the Presidential Protective Division. As a Special Agent of the FBI, I am authorized to investigate violations of laws of the United States, as well as execute arrest and search warrants as they pertain to federal criminal codes of the United States. I have participated in a wide variety of criminal investigations, to include those pertaining to violent crimes, including bank robberies and gang related criminal activities.

**FACTS SUPPORTING PROBABLE CAUSE**

6. On July 5, 2008, at approximately 7:50PM, I was advised by the Salinas Police Department (SPD), of the following:

- that on the same date, at approximately 7:13PM, an armed robbery had occurred at a branch of the US Bank located at the Nob Hill Foods supermarket, 1320 South Main Street, Salinas, California; two female victim tellers, later identified as ROSEL and Karen Lara, were present during the robbery;

- that the suspect who committed the offense, initially identified as an unknown male (UM), entered the bank dressed in a black suit jacket, blue dress shirt with a tie, black slacks, dark glasses, a wig, and black shoes;

- that the UM passed a note to ROSEL, and later brandished a gun to both victim tellers, instructing them to give him money or he would kill them; the UM subsequently left on foot with

approximately $20,000; $17,650 of which was later recovered by SPD;

- that an eyewitness, Christine Johnson, reported that a male matching the description of the suspect, who was on foot, ran into the vehicle she was driving; the man slid off of the hood of Johnson's vehicle, then ran to a white Chevy Yukon and drove away;

- that Ms. Johnson saw bills falling from the person of the UM; she picked up three $20 bills from the scene and turned them over to SPD;

- that SPD subsequently stopped a white Chevy Yukon matching the description provided by Ms. Johnson. The driver, later identified as ZENDEJAS, was wearing clothes that matched the description of the robbery suspect; additionally, as SPD officers ordered ZENDEJAS out of the vehicle, they saw large bulges in ZENDEJAS's pants pockets; the bulges were later identified as large wads of money;

- that SPD officers also found the following items in the Yukon: a black wig, latex gloves, a black BB gun resembling a semi-automatic pistol, a case of BBs (for a BB gun), ZENDEJAS's cellular phone, and a large amount of money strewn about in the back compartment of the vehicle;

- that while at the vehicle stop location, eyewitnesses Lara, Johnson, and ROSEL participated in an in-field line-up;

Lara identified Zendejas as the individual who had robbed the bank; Johnson identified him as the person who had run into her car; while ROSEL stated that the man was not the suspect who had robbed the bank, offering that the robber was definitely a black male (ZENDEJAS is Hispanic);

- that ZENDEJAS was arrested for bank robbery charges and transported to SPD for processing; and

- that after waiving his Miranda rights, ZENDEJAS admitted to robbing the bank; additionally, while enroute to the SPD facility for processing, ZENDEJAS made several spontaneous, unsolicited statements including asking if this was the first time that a robbery had occurred in Salinas, and whether he would serve 15 years for what he had done.

7. On the same date, I arrived at the SPD facility, where I was advised of the following developments:

- that ZENDEJAS had stated that ROSEL was his girlfriend and that she worked at the victim bank;

- that ZENDEJAS knew that his girlfriend would be working at the bank when he planned to rob it;

- that victim teller Lara had set off the silent alarm at the bank during the robbery;

- that the security company which handles the bank alarm had called the branch while the robbery was in progress to confirm the legitimacy of the alarm;

- that, as attested to by victim teller Lara, ROSEL had given security company the code indicating that it was a false alarm; and

- that ZENDEJAS had been identified as being on probation status with San Benito County with search and seizure provisions allowed because of his probation status under gang conditions; ZENDEJAS' identified place of residence was 160 Sierra Court, Hollister, California.

8. On the same date, SPD Officer Kim Robinson and I interviewed ZENDEJAS at the SPD facility. ZENDEJAS was again read his Miranda rights, which he again waived. ZENDEJAS admitted that he understood why he was at the SPD facility stating, "because I robbed a bank." ZENDEJAS stated that he had robbed the bank to pay $1,000 to a local Norteno gang member, whom he identified as "Fat Joe," after "Fat Joe" had accused ZENDEJAS of stealing a car stereo from him. ZENDEJAS stated that he feared for his family, and denied that the amount he needed to pay "Fat Joe" had anything to do with paying the local Norteno gang for taxes (dues) or drugs. ZENDEJAS stated that he had originally planned to rob a stereo shop, but opted for a bank because he thought it would be faster. He further stated that he opted to commit the robbery in Salinas, because local law enforcement in Hollister was too familiar with him.

9. ZENDEJAS further confirmed that ROSEL was his girlfriend and that he knew that she worked at the bank that he planned on robbing. He added that he knew she would be at the bank at the time that he planned on robbing the branch. He stated that he had been text messaging her throughout the day, asking about her schedule. ZENDEJAS stated that he began asking ROSEL specifics about the bank the day before, including who would be working with her that day (Saturday, July 5th). He stated that ROSEL appeared to become suspicious regarding the questioning, adding that she at one point told him that he had better not do anything stupid. He further stated he had text messaged her a couple of times that day to see whether she was off work yet, asking her how long she expected to be there. According to ZENDEJAS, the cell phone he used to text message ROSEL belonged to his sister, which she allowed him to borrow prior to his leaving Hollister. ZENDEJAS stated that he believed that ROSEL could have recognized him during the robbery, but was not sure.

10. On 07/06/2008, a probation search was conducted on the room inhabited by ZENDEJAS and ROSEL located at 160 Sierra Court, Hollister, California. Items seized included latex gloves which appeared similar to those found in the Yukon driven by ZENDEJAS at the time of the vehicle stop, a US Bank schedule, and a box of Crossman Co2 cartridges used for BB guns. ROSEL,

who was present during the search, was arrested by SPD and taken into custody for questioning.

11.  On the same date, SPD Officer Robinson and I interviewed ROSEL at the SPD facility regarding her knowledge of the robbery. Prior to the interview, ROSEL was read her rights per Miranda, which she waived. ROSEL initially insisted that she did not know about the robbery in advance, nor did she realize that the robber was ZENDEJAS, whom she acknowledged was her boyfriend, until after he was arrested. She later recanted her story, admitting that she realized it was ZENDEJAS while the robbery was occurring, but did not identify him to law enforcement out of fear. ROSEL further admitted that despite her initial statement to SPD, she did recognize ZENDEJAS during in the in-field lineup, but declined to tell identify him. When pressed as to why she did not identify ZENDEJAS at the time, ROSEL responded that she was embarrassed, and also that she was afraid that she would be seen as an accomplice.

12.  ROSEL further confirmed that she had given the "false alarm" code to the security company, adding that they (the security company) shouldn't have canceled the alarm. ROSEL stated that the proper procedure for canceling the alarm would be to give the code, followed by letting them (the security company) know that everything was fine, and that they were not being robbed. ROSEL stated that she was nervous during the